*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
KISOR, KIRKBY, and HARRELL
Appellate Military Judges

———————————

**UNITED STATES**
*Appellee*

**v.**

**Wendell E. MELLETTE Jr.**
Electrician's Mate Petty Officer First Class (E-6), U.S. Navy
*Appellant*

**No. 201900305 (f rev)**

———————————

Decided: 8 July 2025

Appeal from the United States Navy-Marine Corps Trial Judiciary
*upon further review following remand from*
*the Court of Appeals for the Armed Forces*

Military Judges:
Warren A. Record (trial)
Rachel E. Trest (*Dubay* hearing)

Sentence adjudged 16 August 2019 by a general court-martial tried at Naval Air Station Jacksonville, Florida, consisting of members with enlisted representation. Sentence approved by the convening authority: confinement for five years and a dishonorable discharge.

For Appellant:
*Major Colin W. Hotard, USMC*

For Appellee:
*Lieutenant Colonel Candace G. White, USMC*
*Lieutenant Commander James P. Wu Zhu, JAGC, USN*

For Amicus:
*Peter Coote, Esq.*

Senior Judge KIRKBY delivered the opinion of the Court, in which Senior Judge KISOR and Judge HARRELL joined.

_____

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

_____

KIRKBY, Senior Judge:

Appellant was convicted in 2019, contrary to his pleas, of sexual abuse of a child in violation of Article 120b, Uniform Code of Military Justice (UCMJ).[1] This case is before us again following remand by the Court of Appeals for the Armed Forces (CAAF) in July 2022 and an extensive fact-finding process described further below. The issue here is whether the military judge's denial of Appellant's discovery motion seeking production of the complaining witness's mental health records materially prejudiced Appellant at trial. Appellant asserts that the erroneous denial of production of the complaining witness's mental health documents deprived him of the right to present a complete defense. We disagree.

## I. BACKGROUND

In August 2013, the complaining witness, Stacy,[2] the 15-year-old sister of Appellant's then-wife, Ms. Mitchell, underwent a week of inpatient mental health treatment for ongoing depression and anxiety, which had resulted in

---

[1] Article 120(B), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b.

[2] All names in this opinion, other than those of Appellant, the judges, and appellate counsel, are pseudonyms.

her cutting herself. At the inception of the inpatient treatment, Stacy was assessed using a Global Assessment Functioning (GAF) score.[3] One week later, upon discharge, Stacy was again assessed using a GAF score. At that time, Stacy was prescribed Fluoxetine Hydrochloride (Prozac) and continued receiving professional counseling for about a year. She remained on Prozac for some time but discontinued its use because it caused her to have nightmares.

Several months after Stacy's discharge from the mental health facility, Appellant started taking on a more big-brotherly role toward her. This included having one-on-one conversations with her, and taking her on rides in his truck to get ice cream or run errands.[4] During these rides Appellant began placing his hand on Stacy's thigh and her upper back between her shoulders, and once slid his hand down and undid her bra through her shirt. On another occasion, in the home where they both lived with Ms. Mitchell and Stacy's parents, he asked Stacy to walk over to look at something on his computer or phone and then touched her back, thigh, and buttocks.[5]

When Appellant deployed with USS *Tennessee* (SSBN-734) from February to April 2014, Stacy sent him provocative emails telling him things like "when you were touching me, I wanted more"[6] and asking him what he would think if she told him she wanted "to f[***]" [him]."[7] Stacy's emails were intercepted by *Tennessee*'s email monitoring system, and Appellant was confronted about them by his chain of command. Appellant explained that the emails were from his wife's little sister, that she was infatuated with him, and that the comments related to him innocently placing his hand on her shoulder. His command had him email Stacy instructing her to stop emailing him. He also sent an email to Ms. Mitchell informing her about the situation.

Nevertheless, Appellant told a friend and colleague aboard the submarine that he was contemplating doing what Stacy's email suggested, i.e. having sex with her. At some point after he returned from deployment, Appellant resumed his one-on-one interactions with Stacy, which became more overtly sexual. He kissed her; touched her thighs, buttocks, and vaginal area; commented on her

---

[3] Global Assessment of Functioning (GAF) is a scoring system for the severity of illness in psychiatry. The GAF score was a psychiatric assessment and organization of biopsychosocial information using a formulation from five axis. *See* Diagnostic and Statistical Manual of Mental Disorders Fourth Edition (DSM IV).

[4] App. Ex. VII at 8.

[5] R. at 439.

[6] App. Ex VII at 24.

[7] App. Ex VII at 20.

buttocks and the size of her breasts; and asked, coarsely, whether she was aroused.[8] Eventually, he began having vaginal intercourse with her and he did so on a number of occasions.

In mid-February 2015, Ms. Mitchell caught Appellant kissing Stacy. When confronted, Appellant denied they were having sex. However, Stacy had told her boyfriend and her two closest female friends about her relationship with Appellant. The local Department of Children and Family Services (DCF) received a report of an inappropriate relationship made by Stacy's boyfriend and sent personnel to Stacy's house to investigate. When questioned by DCF, Stacy denied anything had happened between her and Appellant.

Unsurprisingly, Appellant and Ms. Mitchell separated soon after his relationship with Stacy came to light. They divorced in 2016. Custody of their daughter, Christine, was awarded to Ms. Mitchell with visitation rights to Appellant. In 2018, Appellant successfully petitioned for a modification of the custody arrangement to enable Christine to visit him in Guam, where he was then stationed. When Ms. Mitchell subsequently refused to allow Christine to be picked up for a scheduled visitation per the custody arrangement, Appellant filed a petition for Ms. Mitchell to be held in contempt of court.

In response, Ms. Mitchell went with her mother to Appellant's commanding officer and reported Appellant's prior inappropriate relationship with Stacy from several years before. Stacy's mother spoke to Stacy about what had happened between her and Appellant and helped Stacy reconstruct the timeline of events. At her mother's urging, Stacy agreed to be interviewed by the Naval Criminal Investigative Service (NCIS) in June 2018. During the interview, Stacy told NCIS that Appellant had committed the sexual conduct with her when she was still 15 years old, but admitted she had "always been horrible with remembering times and dates."[9] She said she did not report what happened sooner because Appellant had told her not to and she was scared of him. In April 2019, Stacy testified in a civil deposition in connection with Appellant and Ms. Mitchell's custody dispute over Christine. When asked during the deposition about her sexual interactions with Appellant, Stacy stated that she was not sure of the dates or specific timeframes, but that the touching occurred prior to the sexual intercourse.

The timing of the sexual conduct in relation to Stacy's 16th birthday, in mid-July 2014, was a central issue at Appellant's court-martial. Both the offenses charged against him—sexual abuse of a child and sexual assault of a

---

[8] R. at 445.

[9] App. Ex. XXXII at 29.

child—required the Government to prove beyond a reasonable doubt that Stacy was under the age of 16 years at the time of the offense. Appellant's friend from the submarine testified that Appellant admitted having sexual intercourse with Stacy, but believed this disclosure did not occur until late-July or August 2014. Appellant admitted during a recorded telephone conversation with Stacy's father that he had sex with Stacy multiple times but maintained it did not happen until after her 16th birthday. Stacy testified she had trouble remembering dates and times, and could "remember things from a couple of weeks ago but not a couple of years ago," but she was "very sure" and "100 percent sure" that Appellant touched her in a sexual way and started having sexual intercourse with her when she was 15 years old.[10] She testified she was sure of this because the first time Appellant had sexual intercourse with her was when Ms. Mitchell was still pregnant with Christine, who was born in June 2014, a month prior to Stacy's 16th birthday.

The members convicted Appellant of sexual abuse of a child by touching Stacy on "divers," or multiple, occasions with an intent to gratify his sexual desire, but acquitted him of sexual assault of a child by having vaginal sex with her.

## II. PROCEDURAL HISTORY

In 2021, this Court reviewed the record of trial and related appellate filings from Appellant's contested general court-martial. The case concerned acts that occurred in 2013-14.[11] This Court found that Appellant's lack of access to Stacy's mental health diagnosis and treatment resulted in prejudice that affected the post-deployment allegations, which had been supported only by Stacy's testimony.[12]

In 2022, the CAAF set aside our decision, finding that the requested mental health records, including dates of mental health visits, treatments provided and recommended, and diagnosis "were not protected from disclosure by [Military Rule of Evidence] 513(a) . . . ."[13] The CAAF remanded the case, directing us to order a *DuBay*[14] hearing "for the purpose of obtaining any records that were responsive to Appellant's original motion to compel and determining whether those records should have been provided to Appellant prior to his

---

[10] R. at 452, 460, 481.

[11] *United States v. Mellette*, 81 M.J. 681 (N-M. Ct Crim. App. 2021).

[12] *Id*. at 695.

[13] *United States v. Mellette*, 82 M.J. 374, 381 (C.A.A.F. 2022).

[14] *United States v. DuBay*, 17 C.M.A. 147, 37 C.M.R. 411 (1967).

court-martial."[15] In November 2022, this Court remanded the case for a *DuBay* hearing consistent with the CAAF's directive. The *DuBay* judge held hearings in January, April, and September 2023. The *DuBay* judge directed the Government to secure mental health records from the three providers who had treated Stacy: a retired social worker; the University of Florida Health Psychiatric Hospital (Vista); and a doctor from Gainesville Primary Care Physicians, LLC (hereinafter collectively "providers"). Simultaneous with the *DuBay* judge's initial action, victim's counsel, on behalf of Stacy, had petitioned for certiorari with the United States Supreme Court asking for review of the CAAF's decision.[16]

In March 2023, victim's counsel sued the providers in Alachua County, Florida Civil Division.[17] That suit sought to prohibit disclosure of Stacy's mental health records under Article I, Section 16 of the Florida Constitution. The Supreme Court denied *certiorari* on 20 June 2023 and the suit in Alachua County was withdrawn. Appellant, Appellee, and Amicus Curiae (Patient/Victim) subsequently filed appropriate briefs with this Court.

Our remand order directed the *DuBay* judge to make detailed findings of fact on the following:

> 1) Whether records that would be responsive to Appellant's original motion to compel exist;
> 2) Whether the trial court is in possession of those responsive records; and
> 3) If records responsive to Appellant's original motion to compel are obtained, to then determine whether those records should have been provided to Appellant prior to his court-martial in accordance with the holding in *United States v. Mellette*.[18]

## III. LAW

We review a military judge's findings of fact at *DuBay* hearings under a clearly erroneous standard and the conclusions of law de novo.[19] "A finding of fact is clearly erroneous when there is no evidence to support the finding, or

---

[15] *Mellette*, 82 MJ at 381.

[16] App. Ex. LXVI.

[17] App. Ex. XCI.

[18] *United States v. Mellette*, NMCCA No. 201900305 (N-M. Ct. Crim. App. Nov. 18, 2022) (Order).

[19] *United States v. Wean*, 45 M.J. 461, 463 (C.A.A.F. 1997).

when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."[20]

Generally, the parties to a court-martial "shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe."[21] The rules prescribed by the President provide that "[e]ach party is entitled to the production of evidence which is relevant and necessary."[22] Evidence is relevant if it has any tendency to make a fact of consequence in determining the action more or less probable than it would be without the evidence.[23] "Relevant evidence is necessary when it is not cumulative and when it would contribute to a party's presentation of the case in some positive way on a matter in issue."[24]

Relevant and necessary evidence can be excepted from production or disclosure by a proper claim of privilege.[25] The privilege at issue here—the psychotherapist-patient privilege—provides:

> A patient has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made between the patient and a psychotherapist or an assistant to the psychotherapist, in a case arising under the Uniform Code of Military Justice, if such communication was made for the purpose of facilitating diagnosis or treatment of the patient's mental or emotional condition.[26]

Military Rule of Evidence (Mil. R. Evid.) 513(b)(4) provides that communications are confidential if "not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional services to the patient or those reasonably necessary for such transmission of the communication."[27]

---

[20] *United States v. Criswell*, 78 M.J. 136, 141 (C.A.A.F. 2018) (citations omitted) (internal quotation marks omitted).

[21] 10 U.S.C § 846.

[22] Rule for Courts-Martial (R.C.M.) 703(f)(1).

[23] Military Rule of Evidence (Mil. R. Evid.) 401.

[24] R.C.M. 703(f), Discussion.

[25] Mil. R. Evid. 501.

[26] Mil. R. Evid. 513(a).

[27] Mil. R. Evid. 513(b)(4).

Before ordering such privileged material produced, even for *in camera* review, the military judge must find the moving party has demonstrated four things by a preponderance of the evidence:

> (A) a specific, credible factual basis demonstrating a reasonable likelihood that the records or communications would contain or lead to the discovery of evidence admissible under an exception to the privilege;

> (B) that the requested information meets one of the enumerated exceptions under subsection (d) of [Mil. R. Evid. 513];

> (C) that the information sought is not merely cumulative of other information available; and

> (D) that the party made reasonable efforts to obtain the same or substantially similar information through non-privileged sources.[28]

If the military judge determines each of the above factors is met except for one of the rule's enumerated exceptions, the military judge must then determine whether in camera review is constitutionally required, and if so, take further action as necessary.[29]

The Sixth Amendment provides in relevant part that: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."[30]

The Confrontation Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.[31]

As the CAAF noted in *United States v. Bench*, "the [U.S.] Supreme Court has consistently held that the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose infirmities in a witness's testimony through cross-examination."[32] On the theory that it is always more difficult to tell a lie about a person to his face than behind his

---

[28] Mil. R. Evid. 513(e)(3).

[29] *J.M. v. Payton-O'Brien*, 76 M.J. 782, 789-90 (N-M. Ct. Crim. App. 2017).

[30] U.S. Const. amend. VI.

[31] *Crawford v. Washington*, 541 U.S. 36 (2004).

[32] *United States v. Bench*, 82 M.J. 388 (C.A.A.F. 2022) (citing *Delaware v. Fensterer*, 474 U.S. 15 (1985)) (internal quotation marks omitted) (cleaned up).

back, the Supreme Court has held that a full and fair opportunity to cross-examine generally "guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact."[33]

## IV. DISCUSSION

### A. The *DuBay* Judge Made Findings of Fact That Are Not Clearly Erroneous.

The *DuBay* judge made eight findings of fact which we summarize as follows:

1) The Defense filed a motion to compel discovery of Stacy's mental health treatment providers, diagnoses, and treatment and prescription history.

2) The Defense was aware Stacy had made statements to NCIS regarding her mental health and had testified in a family court deposition. The Defense had the relevant deposition transcript.

3) The Defense was aware that Stacy had been admitted for inpatient treatment at Vista in August 2013 for depression, anxiety, and self-harm.

4) The Defense was aware Stacy had been prescribed Prozac and another unknown medication. Defense was also aware that Stacy had stopped taking the medication in 2019 due to the side-effect of nightmares.

5) Defense was seeking diagnoses, medication and treatment information based on: a potential diagnosis, by the Defense's expert consultant, of Borderline Personality Disorder (BPD) which features attention seeking and manipulative behaviors; the likelihood Stacy had been diagnosed with BPD; and that a diagnosis of BPD implicates suggestibility, ability to recall, and truthfulness. The Defense conceded that anxiety, depression and self-cutting do not affect credibility.

6) The Defense expert consultant opined that BPD is more likely documented in outpatient records than inpatient records.

7) The *DuBay* Court received mental health records that reflected: the providers' identities; dates of treatment; diagnoses (PTSD, anxiety, and depression); GAF scores; and medication prescribed.

---

[33] *Coy v. Iowa*, 487 U.S. 1012 (1988) (citing *Kentucky v. Stincer*, 482 U.S. 730 (1987)).

8) The Defense submitted a declaration from Major Whiskey, an expert consultant in psychology.[34]

We find ample support for each of these findings. As none are clearly erroneous or challenged by the parties, we accept them.

**B. Documents Responsive to Appellant's Discovery Motion Existed and Should Have Been Produced.**

We answer the CAAF's first question, whether any records responsive to Appellant's original motion to compel should have been provided to Appellant prior to his court-martial, in the affirmative. In response to the *DuBay* judge's order, the providers turned over nearly 60 pages of mental health documents relating to Stacy. These records are largely redacted leaving exposed only information that complied with the CAAF's ruling. From the non-redacted portions of these documents, Appellant identified five pieces of information that he claims are new:

(1) The identities of the providers;

(2) Stacy's appointment dates;

(3) A Post-Traumatic Stress Disorder [PTSD] diagnosis;

(4) A Venlaxfaxine Hydrochloride prescription; and

(5) The GAF score from her in-patient treatment.

Appellant's original motion requested "[Stacy's] mental health records: to include the dates visited said mental health provider, the treatment provided and recommended, and her diagnosis."[35] The non-redacted portions of the documents turned over were non-privileged and responsive to this request and should have been provided to Appellant prior to his court-martial. The Government, in its Answer, concedes this point.[36]

The CAAF next directs us to determine whether the military judge's original denial of Appellant's motion to compel materially prejudiced Appellant's defense.[37] We hold that it did not.

---

[34] Major Whiskey's declaration is discussed at length later in this opinion.

[35] App. Ex. III at 1.

[36] The Government's Answer at 19.

[37] *United States v. Mellette*, 82 M.J. 374, 381 (C.A.A.F. 2022).

**C. The Required Production of Evidence in the Discovery Process Does Not Automatically Equate to Admissibility of That Evidence at Trial.**

Information, documents, or other evidence turned over, or disclosed, to the defense pursuant to Rule for Courts-Martial (R.C.M.) 703 is not automatically admissible at trial. "Relevant and necessary" evidence under R.C.M 703(e) does not equate to admissibility of that evidence at trial, even when applying the definition of "relevance" from Mil. R. Evid. 401. This is clear from Mil. R. Evid. 403 which specifically states that "the military judge may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence."[38]

Appellant asserts that the *DuBay* judge reached confusing conclusions when she found the new information relevant and necessary but cumulative. We see no confusion here. The *DuBay* judge correctly found that the mental health records discussed above were relevant and necessary in accordance with R.C.M. 703(e). This holding reflects the nature of the discovery process. Logically, R.C.M. 703(e) is primarily applicable during the pretrial phase of the military justice process – it would be counterintuitive and judicially inefficient to require discovery only be turned over to the defense at trial. Relevant evidence, in the discovery stage, is necessary when it is not cumulative. But, that same information could become cumulative, for admissibility and confrontation purposes, with other evidence presented at trial.

At the time of Appellant's original motion to compel, some of the information from the mental health records was "relevant and necessary." But it was cumulative at trial with other information the Defense had access to or possession of.

**D. Information From the Documents That Should Have Been Produced Was Not Admissible at Trial.**

Three of the five items that were identified as new were found to be relevant and necessary by the *DuBay* judge in accordance with R.C.M. 703 and warrant further discussion. We have reviewed the redacted mental health records turned over by the providers and agree with the *DuBay* judge concerning the status of the information.

i) Post-Traumatic Stress Disorder (PTSD) diagnosis from 2019. The Diagnostic and Statistical Manual of Mental Disorders (DSM) 5 criteria for PTSD

---

[38] Mil. R. Evid. 403.

requires a psychotherapist to specify "with dissociative symptoms" when they are present – there is no evidence in the record of such things and none noted by Major (MAJ) Whiskey.[39] In fact, MAJ Whiskey states in his declaration that "A review of [her] underlying symptoms, and when those symptoms first occurred would be required."[40] Major Whiskey's general assessment that "the PTSD *could* prove relevant" because "individuals with a history of PTSD *may* experience dissociated symptoms" and that "PTSD *can* taint perception" is entirely speculative.[41] Nothing in the records suggest these things happened to Stacy. A selective focus on some generally associated conditions has little, if any, probative value.

Rule 513 protects communications between a Patient and a Psychotherapist. Because there is nothing in either the original record or the additional documents from the providers that forms a basis to suggest Stacy suffered dissociated symptoms or perception issues, the only way MAJ Whiskey, and thus Appellant, could get the underlying symptoms that led to this diagnosis would be prohibited by Mil. R. Evid. 513. Therefore, the PTSD diagnosis offers no additional information or lines of inquiry to Appellant.

ii) Venlafaxine Hydrochloride prescription. The *DuBay* judge correctly points out that Appellant was aware, at trial, that Stacy had been prescribed Prozac. The new medical records clarify that Stacy was prescribed Prozac first when she was discharged from Vista in 2013[42] and a second time in early 2019 by a different provider.[43] The records also indicate that Stacy discontinued using Prozac due to the nightmares it caused. Prozac was specifically mentioned by Stacy in her civil deposition[44] – related to medicine she was taking and why she stopped taking it. The Defense clearly had this deposition transcript, as they used it in cross-examination. The records also indicate Stacy

---

[39] Major Whiskey is a licensed clinical psychologist who is a defense consultant in this case. Major Whiskey provided a sworn declaration (App. Ex. CXVII) to the *DuBay* judge relating to the mental health records furnished by the providers in this case.

[40] App. Ex. CXVII at 1.

[41] App. Ex. CXVII; The declaration by MAJ Whiskey contains several erroneous or inaccurate references and omits any mention of specific information that we believe is critical in evaluating Stacy's mental health at issue. For these reasons we are skeptical of the conclusions drawn by MAJ Whiskey.

[42] App. Ex. CVII.

[43] App. Ex. CVIII.

[44] App. Ex. III Enclosure (H) at 12-13.

was prescribed Venlafaxine Hydrochloride (brand name Effexor) [45] in June and July 2019. Nothing about Effexor suggests it impedes memory, recollect, or contributes to delusions. Indeed, knowing that Stacy was prescribed Effexor would have prohibited Appellant from speculating before the members (as his counsel did) about what the then-unknown medication was. So, while learning Stacy was prescribed Effexor was new, that information provided no additional or alternative avenues of impeachment.

iii) Global Assessment Functioning (GAF) score. Major Whiskey, in his declaration to the *DuBay* judge, correctly notes that a GAF scale of 21-30 indicates it is "possible" Stacy "may" have been experiencing delusions. [46] Major Whiskey states that this level indicates "severe dysfunction: Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas." [47] However, the DSM IV also indicates this GAF level indicates "brief psychotic disorder" where delusion is one of four symptoms that could have lasted 1 day to less than 1 month with eventual full return to premorbid level of function. [48] Maj. Whiskey further stated that one of several delusions possible is Erotomania or "delusional love." [49] In fact, the DSM-5 lists Erotomania as one of seven possible delusions. There is nothing in the record that suggests Stacy suffered from Erotomania or any of the other six possible delusions. Further, as pointed out by the Amicus, the GAF system was abandoned by the DSM-5 that was published in 2013. The American Psychiatric Association indicated that:

---

[45] Pursuant to Mil. R. Evid. 201 we take Judicial Notice of certain facts related to Venlafaxine Hydrochloride - Venlafaxine is an antidepressant that belongs to a group of medicines called serotonin-norepinephrine reuptake inhibitors (SNRIs). It works by increasing the amount of natural chemicals called serotonin and norepinephrine in the brain. The most common side effects of venlafaxine are: Unusual dreams, Sexual problems, including less interest in sex, problems with ejaculation, or problems getting or keeping an erection, Feeling less hungry, Constipation or diarrhea, Nausea or vomiting, Dry mouth, Feeling unusually weak or tired, Change in sleep habits, including sleepiness or trouble sleeping, Yawning, Shaking, Dizziness, Blurred vision, Sweating, Feeling anxious or nervous, Headache, Fast heart rate. https://www.webmd.com/drugs/2/drug-1836/effexor-oral/details.

[46] App. Ex. CXVII at 1.

[47] *Id.*

[48] Pursuant to Mil. R. Evid. 201, we take Judicial Notice of certain facts related to the DSM IV including the Diagnostic criteria for 298.8 Brief Psychotic Disorder.

[49] App. Ex. CXVII at 1.

> [O]ne of the key changes from DSM-IV to DSM-5 is the elimina-
> tion of the multi-axial system. DSM-IV approached psychiatric
> assessment and organization of biopsychosocial information us-
> ing a multi-axial formulation. There were five different axes . . .
> and Axis V was an assessment of overall functioning known as
> the GAF. The GAF scale was dropped from the DSM-5 because
> of its conceptual lack of clarity (i.e., including symptoms, suicide
> risk, and disabilities in the descriptors) and questionable psy-
> chometric properties (American Psychiatric Association,
> 2013b).[50]

This DSM change alone raises the question of legitimacy in the GAF scale and puts the issue directly under the Mil. R. Evid. 403 microscope. Additionally, the scale Maj. Whiskey discussed in his declaration was at Stacy's intake in August 2013 before the events in question. One week later, upon discharge, Stacy's GAF scale was 61-70. The DSM-IV describes this level as:

> Some mild symptoms OR some difficulty in social, occupational,
> or school functioning, but generally functioning pretty well, has
> some meaningful interpersonal relationships.[51]

We agree with the *DuBay* judge that "the improvement of [Stacy's] GAF scores appears to be consistent with her receiving inpatient treatment . . . and improving enough to be discharged."[52]

Given the complex and questionable nature of GAF scales and the totality of the issue (timing, different scores, and lack of supporting evidence of the Defense position) in this case, we believe, at best, a time-consuming and needless trial-within-the-trial would have occurred. Mil. R. Evid. 403 permits the exclusion of relevant evidence where the probative value is substantially outweighed by "confusing the issues" or "misleading the members." Any effort by the Defense at trial to limit the evidence to the original GAF scale would also run afoul of this rule. The *DuBay* judge found that "[t]he information contained in these newly discovered mental health records is cumulative with other information that was already available to the Defense, and based on the parties

---

[50] Center for Behavioral Health Statistics and Quality (2016). Impact of the DSM-IV to DSM-5 Changes on the National Survey on Drug Use and Health. Substance Abuse and Mental Health Services Administration, Rockville, MD.

[51] DSM IV, Global Assessment of Functioning Scale.

[52] App. Ex. CXCIV at 10.

arguments, would not have been admitted at trial on the merits or pre-sentencing proceedings."[53] We agree. Additionally, we are convinced beyond a reasonable doubt that the military judge would have and should have properly excluded the GAF scales in accordance with Mil. R. Evid. 403.

**E. The Non-privileged Records Would Not Have Led to Full Discovery of Protected Mil. R. Evid. 513 or Other Evidence.**

Appellant asserts that absent the erroneous denial of the discovery motion, he would have had access to the protected records. This sentiment both exaggerates the nature of the evidence at hand and undercuts the essence of *J.M. v. Payton-O'Brien*.[54] Appellant relies on, and places great stock in, Maj. Whiskey's declaration,[55] but under Mil. R. Evid. 513(e)(3), in order for the military judge to order an in-camera review of records protected by the Psychotherapist-Patient privilege, the military judge must find, by a preponderance of the evidence that the moving party showed:

> 1)     A specific factual basis demonstrating a reasonable likelihood that the records or communications would yield evidence admissible under an exception to the privilege;
>
> 2)     That the requested information meets one of the enumerated exceptions under Mil. R. Evid. 513(d);
>
> 3)     That the information sought is not merely cumulative of other information available, and;
>
> 4)     That the party made reasonable efforts to obtain the same or substantially similar information through non-privileged sources.

Maj. Whiskey's declaration makes it clear that the mental health records turned over to the *DuBay* judge in accordance with the CAAF's ruling on Mil. R. Evid. 513 do not satisfy Mil. R. Evid. 513(e)(3)(A). That is, they do not form a specific factual basis demonstrating a reasonable likelihood that the records or communications would yield evidence admissible under an exception to the privilege.

Appellant's selective use of facts and careful parsing of words from general medical terminology does not demonstrate any, let alone a reasonable, likelihood that the records would yield admissible evidence. Maj. Whiskey's

---

[53] App. Ex. CXCIV at 15.

[54] *J.M. v. Payton-O'Brien*, 76 M.J. at 782.

[55] App. Ex. CXVII.

declaration caveats every meaningful assessment with "may," "possible," "if," "could," or similar words. Nothing in his declaration gives a specific factual basis of anything that would likely be admissible. Despite Appellant's assertion that "the defense had no way of knowing that [Stacy's] non-privileged records revealed evidence of an inability to perceive, remember, or relate events,"[56] the records do not show that. Maj. Whiskey makes generalized statements, including:

> "*[I]f* she had impaired judgment, she *could* have misinterpreted situations."[57]

> "Individuals with a history of PTSD *may* experience dissociated symptoms (e.g. flashbacks) that cause them to lose touch with reality, leading to altered or inaccurate perceptions of events. Similarly, PTSD *can* taint a perception of past events and affect memory"[58]

Appellant then uses these generalizations as the basis for a specific declaration that the records bear evidence of these things. This is simply not accurate; the DSM IV lists more than a dozen symptoms in the "associated constellation"[59] that may occur. Additionally, episodes of "flashback" are described as "rare" by the DSM IV.[60] Appellant thus fails to demonstrate that the privileged mental health records themselves would have been admissible.

Nor would the privileged mental health records likely yield additional evidence that would be admissible. That is, there is no showing by Appellant of a reasonable likelihood that the privileged mental health records would themselves lead to other admissible evidence. Indeed, the core of the previously undisclosed non-privileged mental health records was known to the Defense at the time of trial.

The second prong of Mil. R. Evid. 513(e)(3) requires Appellant to show that the requested information meets one of the enumerated exceptions under subsection (d) of the rule. Military Rule of Evidence 513(d) has seven exceptions; but we note that in *Payton-O'Brien* the Court recognized that there is no longer a "constitutionally required" exception.[61] However, the Court ruled that it may not allow the privilege to prevail over the Constitution. In other words, the

---

[56] Appellant's Brief at 21-22.

[57] App. Ex. CXVII at 1 (emphasis added).

[58] *Id.*

[59] DSM IV at 465.

[60] DSM IV at 464.

[61] 76 M.J. at 787.

privilege may be absolute outside the enumerated exceptions, but it must not infringe upon the basic constitutional requirements of due process and confrontation."[62] Here, Appellant relies on the constitutional right to compulsory process or confrontation to advance the proposition that the denial of the non-privileged mental health records infringed on his right to present a complete defense. We address the constitutional question below.

The third prong of Mil. R. Evid. 513(e)(3) requires that the information sought is not merely cumulative of other information available. Appellant argues that the Court of Military Appeals holding in *United States v. Reece* should guide us here.[63] In *Reece* the defense was precluded from receiving state reports related to one complaining witness's alcohol and drug treatment and another's behavioral and counseling records. The Court found an abuse of discretion where the military judge failed to conduct even an *in-camera* review. Appellant's reliance on *Reece* is misplaced. While the case at hand and *Reece* share some factual similarities, the cases are readily distinguishable. First, *Reece* predates Mil. R. Evid. 513[64] by more than 10 years; therefore, nowhere in the opinion or analysis do the requirements of Mil. R. Evid. 513 factor in. Second, in *Reece* the defense seemingly had no evidence to support its argument that the records sought had probative value. Here, Appellant had access to, and efficiently used, evidence that showed the same core issues. Those included the family court deposition and her NCIS interview – both of which closely track Stacy's testimony at trial. Finally, the *Reece* Court, having found error, returned the record of trial to the Judge Advocate General for the purpose of conducting a *DuBay* hearing.[65] Here, a *DuBay* hearing has occurred, the relevant non-privileged documents are now in hand, and so the cases are procedurally distinguishable.

We find nothing in the new non-privileged documents that reasonably leads to either a full review of the entire mental health records or other non-privileged evidence that would have assisted Appellant at trial or changed the Defense strategy.

---

[62] *Id.* at 788.

[63] *United States v. Reece*, 25 M.J. 93 (C.M.A. 1987).

[64] Military Rule of Evidence 513 was a 1999 amendment to the Manual for Courts-Martial.

[65] *Reece*, 25 M.J. at 96.

**F. The Non-Privileged Mental Health Records Were Not Material to Cross-Examination.**

At trial, Stacy testified to substantially the same facts as appear in her family court deposition.[66] She admitted her week-long stay at Vista for mental health treatment[67] and she acknowledged memory problems as they related to times and dates. Specifically on cross-examination, the colloquy in part was as follows:

Q. There were a few things you didn't remember during that as well?

A. Yes.

Q. You, for instance, didn't remember the year you were in Vista?

A. Yes.

Q. And you didn't remember if Petty Officer Mellette and [Ms. Mitchell] lived at your house when you came out of Vista?

A. That's correct.

Q. Just like today, you weren't sure when you first met Petty Officer Mellette?

A. Yes.

Q. And you didn't remember what grade you were in when you met Petty Officer Mellette?

A. Correct.

Q. You didn't remember exactly when you and his relationship evolved beyond just talking?

A. Not exactly.

Q. You didn't remember when you started developing feelings for Petty Officer Mellette?

A. Not exactly.

Q. In fact, you didn't remember exactly at the family law deposition how many times you and Petty Officer Mellette had sex?

A. Correct.

Q. You didn't remember who initiated the e-mails on that deployment?

---

[66] App. Ex. XXXI.

[67] R. at 431-33.

A. Correct.

Q. You didn't remember when you dated [boyfriend]?

A. Correct.[68]

Stacy responded to multiple additional questions from both trial counsel and defense counsel indicating that she didn't remember specific events or their timing. Her poor memory was well established.

Appellant cites to *United States v. Dedolph* for the proposition that "impeachment evidence is 'material' . . . ."[69] While this is true as a general proposition, it is axiomatic that it is not absolute. Both the Rules for Courts-Martial and case law place limits on the admission of evidence and the scope of cross-examination. *Dedolph* is distinguishable from the case at hand. In *Dedolph* the defense was unaware of a clemency request made by the witness to the convening authority; here, Stacy's mental health issues were well known to the Defense. The issue this Court found in *Dedolph* was that impeachment on one issue does not negate the defense's right to impeach on other grounds. That is, impeachment is not a single avenue where the credibility of the witness is impeached or not. We subscribe to this proposition.

However, in the case at hand the Defense was well aware of the underlying mental issues Stacy had previously discussed and had testified about. Appellant argues that other information on this point was material. We disagree. Appellant is correct that the Sixth Amendment guarantees an accused "a meaningful opportunity to present a complete defense."[70] But, such opportunity is not without limits and the Supreme Court has recognized that "rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."[71] Rule 513 is one such rule that the President has promulgated. In light of our holding in *Payton-O'Brien* we find no conflict between Mil. R. Evid. 513 and Appellant's Sixth Amendment rights.

If the Defense had been unaware of the mental health issues Stacy suffered, we would likely agree, and our assessment of this case might have been more akin to *United States v. Warda.*[72] In *Warda*, the witness denied knowing

---

[68] R. at 462-63.

[69] *United States v. Dedolph*, No. 202100150, 2022 CCA LEXIS 658, at \*14 (N-M. Ct. Crim. App. Nov. 15, 2022) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).

[70] *Crane v. Kentucky*, 476 U.S. 683 (1986) (citations omitted).

[71] *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)) (citations omitted).

[72] *United States v. Warda*, 84 M.J. 83 (C.A.A.F. 2023).

that if she claimed spousal abuse, she could remain in the United States, and the denial of the motion left the defense no reasonable means to refute her testimony. However, unlike in *Warda*, the Defense here knew of the specific credibility issue, and Stacy never denied it. Given Stacy's well-established memory issues, it is entirely foreseeable that the military judge would have exercised control over the cross-examination if and when that line of questioning transitioned from factual failure of memory to speculative reasons about why her memory failed. Both Mil. R. Evid. 403 and 611 permit the military judge to truncate cross-examination.[73] Military Rule of Evidence 611 allows the military judge to exercise reasonable control over the mode and order of examining witnesses to "avoid wasting time."[74] And Mil. R. Evid. 403 allows the military judge to exclude relevant evidence where the probative value is substantially outweighed by "wasting time or needlessly presenting cumulative evidence."[75]

Trial defense counsel, with the assistance of Stacy's family law deposition and the NCIS notes, established and highlighted Stacy's memory issues. As demonstrated in the colloquy above, the members were made very aware of her specific recollection frailties. In light of the well-established memory problems, we see no reasonable benefit to Appellant in a line of questioning that revolved around a speculative "why" those problems arose. The crux of the issue was that Stacy struggled to recall numerous factual details, and the members were made aware of this. Piling on would not have enhanced Appellant's argument and we find no reasonable possibility that foreclosing Appellant from asking additional questions related to Stacy's memory contributed to the finding of guilt. Additionally, trial defense counsel thoroughly explored and highlighted Stacy's motives for reporting her relationship with Appellant and her personal bias. Trial defense counsel's cross-examination included the following:

Q. Your mom helped you create a timeline before you spoke to NCIS?

A. No. She just cleared--help me clear up some things that I was confused about.

Q. Now, speaking of that timeline, before you went to NCIS, you knew that Petty Officer Mellette was trying to take [your niece] to Guam?

---

[73] *See United States v. Goldwire*, 55 M.J. 139, 143 (C.A.A.F. 2001) (explaining that "[T]he judge has discretion under Rule 611(a) and Rule 403 to exclude the evidence when its introduction may be unfair to a party, a waste of time, or confusing to the jury.") (citations omitted).

[74] Mil. R. Evid. 611(a)(2).

[75] Mil. R. Evid. 403.

A. Yes.

Q. Okay. You didn't want [your niece] to go to Guam?

A. Correct.

Q. Your family didn't want [your niece] to go to Guam?

A. Correct.

Q. Okay. And you didn't tell anyone about having sex with Petty Officer Mellette in 2015?

A. That's correct.

Q. You didn't tell anyone about having sex with Petty Officer Mellette in 2016?

A. Correct.

Q. You didn't tell anyone about having sex with Petty Officer Mellette in 2017?

A. Correct.

Q. And last year is when Petty Officer Mellette was trying to take [your niece] to Guam?

A. Yes.[76]

Stacy's agreement with trial defense counsel's questions and her testimony on direct examination, conceding a lack of memory to specific dates, did not necessitate impeachment. Nothing in the non-privileged mental health records would have enhanced or changed the nature of that cross-examination. Trial defense counsel highlighted memory problems and bias; even if the military judge had allowed inquiry into specifics despite Mil. R. Evid. 403, we have no doubt the result would have been the same. The erroneous denial of the non-privileged mental health records did not impact Appellant's ability to cross-examine the witness.

### G. Prejudice

The CAAF's earlier holding in this case, that diagnosis and treatments are not privileged under Mil. R. Evid. 513 and denial of those documents potentially infringed on Appellant's right to confront witnesses against him, reveals only that error occurred at the trial level. Having recognized that error, we must now determine whether it materially prejudiced Appellant's substantial

---

[76] R. at 475-76.

rights. Such an error can fall into one of two distinct categories: either (a) purely statutory violations or (b) statutory violations that also present a constitutional violation. This dichotomy then leads us to the following determination about the appropriate prejudice test that must be applied in each instance: (a) purely statutory violations must be tested for prejudice under the factors provided in *United States v. Kerr*;[77] and (b) statutory violations that also present a constitutional violation must be tested for prejudice under the "harmless beyond a reasonable doubt" standard, as was done in *United States v. Brisbane.*[78]

Amicus here suggests that, in light of the CAAF's ruling on Mil. R. Evid. 513, we should conduct a non-constitutional error analysis. Amicus argues that, in the absence of a CAAF edict that diagnoses and treatment records were constitutionally required, this is an evidentiary rule violation and the non-constitutional error test for prejudice applies. However CAAF's holding was logically caveated on not knowing what, if any, documents were wrongfully withheld in this case, and what, if any, impact they had to the case. Having now reviewed the documents we are in a better position to decide if this is merely a statutory violation or a statutory violation that also presents a constitutional violation.

Prejudice for such a statutory violation would be evaluated under the four part test the CAAF announced in *Kerr*: (1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question.

However, where an error includes a "constitutionally improper denial of a defendant's opportunity to impeach a witness," the question is whether the error is harmless beyond a reasonable doubt.[79] For such a review, we weigh factors including: the importance of the witness' testimony in the prosecution's case; whether the testimony was cumulative; the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; the extent of cross-examination otherwise permitted; and, of course, the overall strength of the prosecution's case.[80]

---

[77] *United States v. Kerr*, 51 M.J. 401 (C.A.A.F. 1999).

[78] *United States v. Brisbane*, 63 M.J. 106, 116 (C.A.A.F. 2006).

[79] *United States v. Chisum*, 77 M.J. 176, 179 (C.A.A.F. 2018) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

[80] *Id.*

Even under the stricter test, which both parties agree applies, Appellant is not entitled to relief. Assuming denial of the non-privileged mental health records was constitutional error, the question is whether that error was harmless beyond a reasonable doubt. The burden is on the Government to show that "there is no reasonable possibility" that the error "contributed to the contested findings of guilty."[81] "An error has not contributed to the verdict when it was 'unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'"[82] That is, there is no reasonable doubt whether the erroneous withholding of the mental health records contributed to the verdict. The CAAF reiterated this point in *United States v. Chisum.*[83]

In accordance with the Supreme Court in *Delaware v. Van Arsdall* and *Chisum*, we consider the following:

a) Stacy's testimony was critical to the Government, her statements established the elements of the offenses Appellant was convicted of, and she alone could relate the details of what occurred. The Government concedes this point; however, we distinguish the cases relied on by Appellant in making this point.[84] Amicus argues the additional evidence that corroborated Stacy's testimony, was compelling, noting the testimony of family members and shipmates, and emails between Appellant and Stacy.[85] While we believe the Government could not, without Stacy's testimony, establish the exact sequence that it needed to show in order to prove when the assault occurred, given the facts the Defense elicited from Stacy on cross-examination we need place little significance on this factor.

b) Stacy's testimony was not cumulative with other evidence. However, under the facts of this case we must also consider the cumulative nature of the additional non-privileged information Appellant should have received. As discussed above, none of the new mental health information was materially different from what the Defense already knew. The Appellant's Sixth Amendment right of confrontation was well protected and there is nothing within the new records that would reasonably change the outcome here. Properly having this information prior to trial

---

[81] *United States v. Othuru*, 65 M.J. 375, 377 (C.A.A.F. 2007) (citations omitted).

[82] *United States v. Collier*, 67 M.J. 347, 356 (C.A.A.F. 2009) (quoting *Yates v. Evatt*, 500 U.S. 391, 403 (1991) (overruled on other grounds)).

[83] *Chisum*, 77 M.J. at 176.

[84] The Government's Answer at 23.

[85] Amicus Br. at 12.

would not, realistically, have changed the Defense strategy at trial, and we remain convinced, applying the appropriate standards of review that the outcome would be the same.

c) There is evidence corroborating Stacy's testimony on material points, that included Appellant's own words, email documentation, and other witness testimony. Material to the Defense was Stacy's memory issue, particularly as it related to dates. This was thoroughly explored and demonstrated before the members. In addition, Stacy's biases, desire to protect family, and feelings towards Appellant were thoroughly covered during cross-examination. The mental health records now available do not disturb either Stacy's testimony or the evidence corroborating that testimony.

d) As discussed, cross-examination was permitted and thoroughly conducted without constraint. Appellant argues that the erroneously withheld mental health records "provided objective evidence of her lack of mental capacity at the time of the allegations . . . ."[86] This conclusion is simply not supported by the record. At best, the new evidence would have led to further affirmation of failed memory as to specific timelines – a point that was established and not controverted. We have no doubt that additional questions, reiterating a point well made by the trial defense counsel on cross-examination, would not have changed the verdict. The damage to Stacy's credibility was inflicted to the extent it could be. Further "piling on" with speculative questioning based on these mental health records would not have further enhanced Appellant's position in any respect. We therefore assess that the damaging potential of the cross-examination was fully realized, and the error in not providing these records before trial was harmless beyond a reasonable doubt.[87]

e) Assessing the overall strength of the Government's case, we recognize that in this type of case there is often limited evidence. Under normal circumstances, the government's case consists of the testimony of the complaining witness and nuggets of corroborating evidence. Here, Stacy's testimony, consistent with her deposition, identified specifics that established the timeline essential to the charge. This included details about moves (including to hotels), her sister's pregnancy, and specific occasions she was with Appellant. The timeline she provided also

---

[86] Appellant's Br. at 29.

[87] *Van Arsdall,* 475 U.S. at 684.

fit other evidence including deployment schedules, testimony from Stacy's friends and emails and the testimony of Appellant's shipmate.

Ultimately, therefore, having reviewed the mental health records that the military judge erroneously denied Appellant access to, we find, beyond a reasonable doubt, no material prejudice to Appellant's defense.

## V. APPELLANT'S ORIGINAL APPEAL

In our original review, this Court found that the findings related to the alleged sexual contact after Appellant's deployment may have been impacted by the military judge's erroneous Mil. R. Evid. 513 ruling "may have contributed to the finding . . ."[88] The Court therefore struck the words "on divers occasions" from the specification of which Appellant had been found guilty and reassessed the sentence from five years to three years of confinement. The CAAF, in reversing our decision,[89] effectively reinstated the "divers" nature of the charge and the original five-year sentence to confinement. Now, having reviewed the mental health records that are not protected by Mil. R. Evid. 513 and concluded that they would in fact not have contributed to the finding, we must once again address Appellant's remaining AOEs from his original appeal.[90]

Appellant originally asserted six AOEs, which this Court renumbers as follows: (1) the military judge abused his discretion by denying a Defense motion for in camera review and production of the victim's mental health diagnoses, treatment, and prescribed medications; (2) the military judge abused his discretion by allowing the Government to admit expert testimony that Appellant fit the profile of a perpetrator who grooms children for sex; (3) the evidence is legally and factually insufficient to support his conviction; (4) the military judge committed plain error by allowing the victim to recommend a specific sentence in her unsworn victim impact statement; (5) the record of trial is incomplete because the military judge failed to attach four enclosures of a Defense motion;[91] and (6) the findings and sentence should be set aside under the cumulative error doctrine.

---

[88] *Mellette*, 81 M.J. at 696.

[89] *Mellette*, 82 M.J. at 381.

[90] *Mellette*, 81 M.J. at 688.

[91] We previously granted a motion to attach the missing enclosures, rendering this AOE moot and now without merit. *See United States v. Matias*, 25 M.J. 356 (C.M.A. 1987).

Appellant's first AOE is resolved above, and we now focus on the remainder. As we did in our first review, we again find merit in Appellant's second, and fourth AOEs, order some of the language stricken from the specification, affirm the finding as to the remaining language, and reassess the sentence.

## A. Profile Testimony Regarding "Grooming"

In his second AOE, Appellant asserted that the military judge erred in admitting testimony from the Government's forensic psychologist that Appellant fit the profile of a perpetrator who grooms children for sex. We review a trial court's decision to admit expert testimony for abuse of discretion.[92] "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous."[93]

### 1. Limits on Expert Testimony

It is well established that "[o]ur system of justice is a trial on the facts, not a litmus paper test for conformity with any set of characteristics, factors, or circumstances."[94] Profile evidence is "evidence that presents a characteristic profile or trait of an offender, and then places the accused's personal characteristic or trait within that profile as proof of guilt."[95]  In *United States v. Banks*, the CAAF held that "generally, use of any characteristic 'profile' as evidence of guilt or innocence in criminal trials is improper."[96] The *Banks* Court reasoned that such evidence is improper because it treads too closely to character evidence offered to show that an accused acted in conformity with that character and committed the act in question, evidence prohibited under M.R.E. 404(b).[97] But expert testimony can be an exception to the general rule that the "use of any characteristic 'profile' as evidence of guilt or innocence in criminal trials is improper."[98] However, profile evidence can be admitted "in narrow and limited circumstances," to include "as purely background material to explain sanity issues[,] . . . as an investigative tool to establish reasonable suspicion . .

---

[92] *United States v. Hays*, 62 M.J. 158, 165 (C.A.A.F. 2005).

[93] *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (citation and internal quotation marks omitted) (citing *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997))).

[94] *United States v. Banks*, 36 M.J. 150, 161 (C.M.A. 1992).

[95] *United States v. Harrow*, 65 M.J. 190, 203 (C.A.A.F. 2007) (citation omitted).

[96] 36 M.J. at 161.

[97] *See Harrow*, 65 M.J. at 203.

[98] *Id.* (citation omitted).

. [or] in rebuttal when a party 'opens the door' by introducing potentially misleading testimony."[99]

In Mil. R. Evid. 702 dealing with [t]*estimony by expert witnesses* provides that:

> A witness qualified as an expert may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.[100]

The rule permits the introduction of expert testimony about certain aspects of victim behavior. For example, witnesses qualified as experts can testify "as to what symptoms are found among children who have suffered sexual abuse and whether the child-witness has exhibited these symptoms," or discuss "various patterns of consistency in the stories of child abuse victims and compar[e] those patterns with patterns in . . . [the victim's] story," but they cannot opine as to whether the individual is telling the truth about an allegation.[101]

In *United States v. Traum*, the CAAF reiterated "the ban on profile evidence exists because this process treads too closely to offering character evidence of an accused in order to prove that the accused acted in conformity with that evidence on a certain occasion and committed the criminal activity in question."[102] The prohibition "is rooted in Mil. R. Evid. 404(a)(1) that precludes the prosecution from introducing character evidence of an accused who has not put his character at issue."[103]

---

[99] *Banks*, 36 M.J. at 161.

[100] Mil. R. Evid. 702.

[101] *United States v. Harrison*, 31 M.J. 330, 332 (C.M.A. 1990) (citations and internal quotation marks omitted).

[102] *United States v. Traum*, 60 M.J. 226, 235 (C.A.A.F. 2004).

[103] *Banks*, 36 M.J. at 161.

In the case at hand, Appellant objected to the Government's intent to elicit testimony from its expert about "grooming behavior," which the expert defined as "behaviors of a perpetrator of child sexual abuse to solicit the access to and compliance of the targeted victim as well as the manipulation in favor with the gatekeepers to that child."[104] The expert opined that Appellant's one-on-one interactions with Stacy—spending "private time," sexually escalating touching, having intimate conversations—were consistent with grooming behavior. The Government argued that the opinion testimony was proper under Mil. R. Evid. 404(b) to prove Appellant's motive, intent, and scheme to have sex with Stacy.[105] Appellant countered that allowing such profile testimony invaded the fact-finding province of the members and was tantamount to impermissibly opining that Appellant "fit[ ] the profile of an offender."[106]

Principally relying on CAAF's decisions in *United States v. Brooks*,[107] *United States v. Bresnahan*,[108] and *United States v. Huberty*,[109] the military judge found it was permissible for the expert to testify that the evidence of Appellant's behavior was consistent with grooming behavior. While the military judge precluded the expert from saying that Appellant had in fact groomed Stacy, that he was a child sex abuser, or that child sex abuse occurred, he overruled trial defense counsel's objection, concluding the expert's testimony did not amount to profile evidence. The military judge found that Supreme Court precedent in *Daubert*,[110] our superior court's precedent in *United States v. Houser*,[111] and Mil. R. Evid. 403 permitted such limited testimony regarding grooming.

The military judge then allowed the Government to elicit testimony from the expert about "grooming" that included:

> [I]nstead of focusing on the victim's side of behaviors, it has to do with the offender's side of behaviors. Grooming specifically

---

[104] R. at 723.

[105] R. at 22.

[106] R. at 730.

[107] *United States v. Brooks*, 64 M.J. 325 (C.A.A.F. 2007).

[108] *United States v. Bresnahan*, 62 M.J. 137 (C.A.A.F. 2005).

[109] *United States v. Huberty*, 53 M.J. 369 (C.A.A.F. 2000).

[110] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[111] *United States v. Houser*, 36 M.J. 392 (C.M.A. 1993).

has to do with behaviors of the offender to gain access to the vic-
tim, maintaining the relationship with the victim. That's one
part of it . . . .[112]

Common patterns of grooming behavior with the "targeted vic-
tim" include "cultivating a special relationship", "[giving] gifts .
. . special privileges, sharing special time together, kind of cre-
ating a special bond." It "typically includes sexually disinhibit-
ing behaviors . . . lower[ing] inhibitions of the child . . . and then
escalating towards more progressively sexually explicit con-
duct."[113]

Behaviors in this court-martial consistent with common pat-
terns of grooming came from the testimony from Stacy, her sis-
ter, her father and from the controlled call to Appellant about
spending time with her, taking car rides, going for ice-cream, the
role of mentor, big brother . . . .[114]

In its closing argument the Government used the expert's very language,
arguing "that's when they started spending a lot of time together, they're
spending alone time together, they're talking, they're going on car rides, going
out to ice cream."[115] Both the specific reference to and insinuation of grooming
are clear in the record.[116]

It is apparent that the Government expert's testimony was elicited and
used to show that Appellant's actions were consistent with patterns of groom-
ing behavior exhibited by child sex abusers. And it is clear that this was done
in order to support the conclusion that Appellant was guilty of the charged
offense of child sexual abuse. This is precisely what the rule against profile
testimony prohibits. Adding to the impact of this improper profile evidence was
its source – a Government expert – whom the military judge, in instructing the
members, described as "an expert witness because her knowledge, skill, expe-
rience, training or education may assist you in understanding the evidence or
determining a fact in issue."[117] In *Huberty*, the government expert's testimony

---

[112] R. at 773-74.

[113] R. at 775.

[114] R. at 776.

[115] R. at 870.

[116] R. at 871.

[117] R. at 861. We note this is the standard military judge's bench book instruction
regarding expert witnesses.

about grooming was used to explain the victim's behavior and rebut the testimony of Huberty's own expert.[118] The CAAF has recognized that "in some circumstances, 'profile evidence' may become logically relevant and thus admissible for some limited purposes."[119] However, in this case the testimony was "admitted for the purpose of showing that Appellant fit the 'profile' of a sex abuser."[120] Therefore, we agree with the Court in our previous decision that the admission of this testimony was erroneous.

*2. Prejudice*

Having again recognized this error, we test for prejudice. As discussed above, for non-constitutional evidentiary errors, the test for prejudice "is whether the error had a substantial influence on the findings."[121] In conducting this analysis, we weigh "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question."[122]

In this case there is no question that sexual relations occurred between Appellant and Stacy. Appellant admitted it to Stacy's father in the controlled call.[123] That admission of multiple sexual encounters with Stacy made the Government's case strong with the exception of the timing of the offenses. Despite Appellant's insistence that intercourse occurred only after Stacy turned 16, there was strong corroborating evidence that at least one instance of sexual abuse occurred prior to the Appellant's deployment in February 2014. Stacy's birth certificate, entered into evidence as Prosecution Exhibit 1, proved that Stacy did not turn 16 until mid-July 2014. Appellant's case relating to the pre-deployment allegation was weak by comparison. While trial defense counsel rightly focused on the timing as the Government's weakest link, there was ample evidence that simply could not be explained away. In light of the totality of evidence admitted, we again find the expert testimony in question was not material to the timing issue for the strong, corroborated claim of pre-deployment sexual abuse. We therefore conclude the error in its admission did not have a

---

[118] 53 M.J. at 373.

[119] *Id.* (citing *Banks*, 36 M.J. at 162).

[120] *Id.* at 373.

[121] *United States v. Kohlbek*, 78 M.J. 326, 334 (C.A.A.F. 2019) (citation omitted).

[122] *United States v. Greene-Watson*, __ M.J. __ , No. 24-0096/AF, 2025 CAAF LEXIS 186 at *19 (C.A.A.F. Mar. 11, 2025).

[123] Pros. Ex. 3.

substantial influence on the findings with respect to that instance, alone among the "divers occasions" charged.

However, we again find that the expert's testimony was material to the post-deployment sexual abuse Stacy testified about. The expert opinion was significant in corroborating Stacy's testimony about escalating nature of the sexual contact. The Government adroitly, but improperly, used this to support Stacy's credibility on the issue of whether she was still 15 years old at the time, arguing that the grooming "patterns of behavior" were "just after she turned 15."[124] The source of the testimony again draws our attention: an expert with scientific "knowledge, skill, experience, training or education" gave credibility to the Government's position. We again conclude that Appellant was prejudiced as to any post-deployment sexual abuse and again remedy this error by striking the words, "on divers occasions," from the specification, which we accomplish in our decretal paragraph.

### B. Legal and Factual Sufficiency

In his third AOE Appellant asserts the evidence is legally and factually insufficient to support his conviction. We review such questions de novo.[125]

#### 1. Law

To determine legal sufficiency, we consider whether when viewing "the evidence in the light most favorable to the prosecution . . . a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt."[126] In conducting this analysis, we are required to "draw every reasonable inference from the evidence of record in favor of the prosecution."[127]

"For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of [this Court] are themselves convinced of the

---

[124] R. at 870.

[125] *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[126] *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[127] *United States v. Mays*, 83 M.J. 277, 279 (C.A.A.F. 2023) (citing *United States v. Blocker*, 32 M.J. 281, 284 (C.M.A. 1991)).

accused's guilt beyond a reasonable doubt."[128] Therein, we take "a fresh, impartial look at the evidence,"[129] applying "neither a presumption of innocence nor a presumption of guilt"[130] to an "independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt."[131] In *United States v. King*, the CAAF made it clear that "[i]n determining whether any rational trier of fact could have determined that the evidence at trial established guilt beyond a reasonable doubt, we are mindful that the term 'reasonable doubt' does not mean that the evidence must be free from any conflict or that the trier of fact may not draw reasonable inferences from the evidence presented."[132]

*2. Analysis*

The elements of the charged offense of sexual abuse of a child are: (1) Appellant committed sexual contact upon Stacy by intentionally touching, directly or through the clothing, her buttocks, thighs, hips, and back with his hand; (2) he did so with the intent to gratify his sexual desire; and (3) at the time Stacy had not attained the age of 16 years.[133]

The Government previously conceded a lack of proof as to "hips." And, now, having reviewed the record anew in its entirety, we agree that "hips" within the specification is factually insufficient. We therefore, as this Court previously did, dismiss the word "hips" from the specification. As discussed above, we again find error materially affecting the words, "on divers occasions," which we conclude must be dismissed due to legal error. The remainder of the specification is, however, legally and factually sufficient. The evidence, including Stacy's testimony, the provocative emails Stacy sent to Appellant, the family's knowledge of their one-on-one interactions, and Appellant's admissions to third parties supported the charge that Appellant touched Stacy's back, thighs, and buttocks for sexual gratification on at least one occasion prior to his de-

---

[128] *Turner*, 25 M.J. at 325. Because the offenses occurred before 2021, we apply the old standard applicable to factual sufficiency analyses for offenses that occurred prior to the amendments to Article 66, UCMJ.

[129] *Washington*, 57 M.J. at 399.

[130] *Id.*

[131] *Id.*

[132] *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citations omitted).

[133] *Manual for Courts-Martial, United States* (2016 ed.), (*MCM*) (2016) pt. IV, para. 45.b.b.(4)(a).

ployment in February 2014. Considering the evidence in the light most favorable to the Government, we conclude a reasonable fact-finder could have found all the essential elements of this offense beyond a reasonable doubt. The evidence is thus legally sufficient to support the conviction. Regarding factual sufficiency, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we, too, are convinced of Appellant's guilt beyond a reasonable doubt.

## C. Improper Evidence in Unsworn Victim Impact Statement

Appellant next asserts that the military judge committed plain error in allowing Stacy to recommend a specific sentence.[134] Rule for Courts-Martial 1001A,[135] was designed to enable crime victims to tell the sentencing authority what impact the accused's misconduct has had on them, not what to do about it. Executive Order (EO) 13825 became effective on 1 January 2019 and was applicable for Appellant's case. Under EO 13825 R.C.M. 1001A became R.C.M. 1001(c).

### 1. Law

The discussion of R.C.M. 1001A(e)(2) stated in part "A victim's unsworn statement . . . may not include a recommendation of a specific sentence."[136] However, under R.C.M. 1001(c)(3), that prohibition moved from the discussion to the rule.[137] Additionally, in the absence of an objection to the improper introduction of evidence at trial we must first determine whether the issue is forfeited or waived.[138] Forfeited issues are subject to plain error review.[139] A finding of plain error requires: 1) error, 2) the error be plain or obvious, and 3) the error materially prejudiced a substantial right.[140] The Court may correct

---

[134] Appellant's fourth AOE.

[135] *MCM* (2016).

[136] R.C.M. 1001A(e)(2) Discussion. The provisions of a discussion section to the R.C.M. are not binding but instead serve as guidance. *See, e.g., United States v. New*, 55 M.J. 95, 113 (C.A.A.F. 2001) (Effron, J., concurring) (referring to an R.C.M. Discussion section as "non-binding"); *See also MCM* (2019), pt. I, para. 4, Discussion ("These supplementary materials . . . do not constitute rules [or] are binding.").

[137] *MCM* (2016), pt. II, para. 1001(c)(3).

[138] *United States v. Bench*, 82 M.J. 388, 392 (C.A.A.F. 2022) (citing *United States v. Jones*, 78 M.J. 37, 44 (C.A.A.F. 2018)) (citation omitted).

[139] *Johnson v. United States*, 520 U.S. 461, 466-67 (1997).

[140] *United States v. King*, 83 M.J. 115, 123 (C.A.A.F. 2023) (citing *United States v. Robinson*, 77 M.J. 294, 299 (C.A.A.F. 2018).

such plain error when it materially prejudices an appellant's substantial rights.[141]

*2. Analysis*

Before the members, Stacy concluded her unsworn statement by saying:

> I ask that as you come to your decision you keep this in mind: I suffered in silence for five years before circumstances made me tell the truth of what he had done to me. I think that he needs a significant amount of jail time to think about the pain he has put me through.

"[A] crime victim of an offense of which the accused has been found guilty has the right to be reasonably heard at the presentencing hearing relating to that offense."[142] "'[V]ictim impact' includes any financial, social, psychological, or medical impact on the crime victim directly relating to or arising from the offense of which the accused has been found guilty."[143] However, the rule in place at the time explicitly precluded a recommendation of a specific sentence; the rule stated, "The statement may not include a recommendation of a specific sentence."[144] A request for a type of punishment or the suggestion of a length of punishment violated the applicable version of R.C.M. 1001(c)(3). Therefore, we hold it was error for the military judge to allow Stacy to state, "I think [Appellant] needs a significant amount of jail time." Our superior court held it improper to admit presentencing testimony opining that an accused has "[n]o potential for continued service," which it found was tantamount to saying "[g]ive the accused a punitive discharge."[145] Similarly, opining that an accused "needs" a certain form of punishment is tantamount to recommending that the sentence include that form of punishment. To allow a victim to make such a recommendation is not in keeping with the framework for victim impact statements established under R.C.M. 1001. Here, Stacy was allowed to tell the members that from her perspective Appellant needed not just confinement, but a "significant amount" of it. In allowing her to make such a recommendation the military judge committed clear and obvious error.

---

[141] *United States v. Powell*, 49 M.J. 460, 465 (C.A.A.F. 1998).

[142] Rule for Courts-Martial, *Manual For Courts-Martial, United States* (2019 ed.) (R.C.M. 2019) 1001(c)(1).

[143] R.C.M. 1001(c)(2)(B) (2019 ed.).

[144] R.C.M. 1001(c)(3) (2019 ed.).

[145] *United States v. Ohrt*, 28 M.J. 301, 305 (C.M.A. 1989).

Shortly after Stacy reminded the members that she "suffered in silence for five years" and that she thought that "he needs a significant amount of jail time to think about the pain he has put me through" trial counsel then argued for a sentence that included five years' confinement. Trial counsel rationalized that "[f]ive years . . . is appropriate . . . The five years that the accused has benefited from committing a secret act and maintaining its secrecy. The five years that [Stacy] has struggled in fear."[146] After one and a half hours of deliberation, the members returned a sentence that included five years' confinement.

When determining whether an error had a substantial influence on a sentence, this Court considers the following four factors: "(1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question."[147]

Appellant asserts the members "took [Stacy's] cue and awarded exactly five years confinement."[148] This is a facially valid claim; however, in applying the substantial influence factors from *United States v. Bowen,* reviewing the comparative strengths of the parties' sentencing cases, we do not find the impact of the unsworn statement to be so material, or of such quality, as to find that it substantially influenced the adjudged sentence. Additionally, even if we determined the unsworn statement substantially influenced the sentence, our reassessment of the sentence herein has remedied any prejudice to Appellant.

### D. Sentence Reassessment

Because the CAAF reversed this Court's previous opinion, we start here with the sentence adjudged at the original trial.[149] The members originally sentenced Appellant to be confined for five years and to be discharged with a dishonorable discharge.[150] Having again set aside some of the language from the specification of which Appellant was convicted, we must determine whether we can reassess the sentence at the appellate level or whether we must remand for the trial court to do so. We do so by determining: (1) whether there have been dramatic changes in the penalty landscape or exposure; (2)

---

[146] R. at 1015.

[147] *United States v. Bowen*, 76 M.J. 83, 89 (C.A.A.F. 2017) (internal quotation marks omitted) (quoting *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999)).

[148] Appellant's Br. (original) at 66.

[149] *See United States v. Katso*, 77 M.J. 247, 249 (C.A.A.F. 2018) (stating reversal of an appellate court's opinion "effectively reinstat[es] Appellee's conviction and sentence").

[150] R. at 1044.

whether sentencing was by members or a military judge alone; (3) whether the nature of the remaining offenses captures the gravamen of the criminal conduct included within the original offenses and whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses; and (4) whether the remaining offenses are of the type with which appellate judges should have the experience and familiarity to reliably determine what sentence would have been imposed at trial.

Again, we determine that we can reassess the sentence. Appellant remains convicted of one specification of sexual abuse of a child under Article 120b, and there is no change in the penalty landscape or his punitive exposure. However, while not changing the gravamen of Appellant's conduct, excepting the words "hips" and more consequently "on divers occasions," from the specification does significantly alter the circumstances of the offense relevant to sentencing. This modification changes the criminal conduct from "two or more occasions"[151] to a single occasion. We also consider that Appellant was originally sentenced by members. However, the specification deals with an offense of the type with which appellate judges generally, and this panel specifically, have sufficient experience on which to reliably determine what sentence would have been imposed at trial. Under the facts and circumstances of this case, as reflected in the totality of the record, once we give no weight to the testimony we have found was erroneously admitted, we are confident that the sentence the members would have imposed for the specification as excepted would have been no less than three years' confinement and a dishonorable discharge. We affirm this reassessed sentence in our decretal paragraph.

### E. Cumulative Error.

Finally, we address cumulative error. "It is well-established that an appellate court can order a rehearing based on the accumulation of errors not reversible individually."[152]

### 1. Law

The CAAF recently succinctly defined cumulative error doctrine as "a prejudice test that looks retrospectively at a court-martial's execution and results to assess the cumulative effect of all plain errors and preserved errors."[153] It is axiomatic that "Courts are far less likely to find cumulative error where evidentiary errors are followed by curative instructions or when a record contains

---

[151] R. at 861.

[152] *United States v. Dollente*, 45 M.J. 234, 242 (C.A.A.F. 1996).

[153] *United States v. Shelby*, No. 24-0186, 2025 CAAF LEXIS 64, at *4 (C.A.A.F. Jan 28, 2025) (unpublished).

overwhelming evidence of a defendant's guilt."[154]  As we have found errors that were not cured at trial, we ask whether we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error."[155]

### 2.  Analysis

We have taken a fresh view of the entire record in this case, including evidence now available that was not in the possession of the parties at trial, this Court on initial appeal, or the CAAF. Considering the entire record, we conclude that the errors as a whole did not undermine the fairness or integrity of Appellant's trial such that we must set aside the entirety of his conviction or sentence. Our remedial action corrects the errors to the degree necessary to reflect our notion of justice.

First, in striking the words "hips" and "on divers occasions" from the specification, we have cleansed the finding of any prejudicial error associated the admission of prejudicial profile testimony. We find that the language remaining in the specification, as discussed above, is supported by overwhelming evidence of Appellant's guilt. Therefore, we hold that, "[a]s to the errors we found, we do not believe there is a reasonable probability that, taken cumulatively, those errors might have contributed to the conviction."

Second, in reassessing the sentence, we have cleansed it of any error associated with either the profile testimony or the victim impact statement. Accordingly, we can again say with certainty that the cumulative effect of these errors has not affected the outcome of this case.

---

[154] *Dollente*, 45 M.J. at 242.

[155] *United States v. Cole*, 84 M.J. 398, 407 (C.A.A.F. 2024) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

## VI. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, the mandate of our Superior Court and the results from the *DuBay* hearing, we **SET ASIDE** and **DISMISS** the words, "hips," and "on divers occasions," from the specification. The findings as to the specification's remaining language and that portion of the sentence extending to a dishonorable discharge and three years' confinement are **AFFIRMED**.

FOR THE COURT:

MARK K. JAMISON
Clerk of Court